**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

v.                          No.  2:11-CR-109-RB

EUTIMIO RIOS-GALAVIZ,

       Defendant.

**PROPOSED FINDINGS OF FACT
AND RECOMMENDATION FOR DISPOSITION**

On this date, I considered Defendant's Motion to Suppress,[1] Memorandum of Law in Support of Defendant's Motion to Suppress Oral Statements,[2] and the corresponding responses filed by the United States of America ("the Government").  *Docs. 31, 47.*  In addition, I conducted an evidentiary hearing on June 22, 2011, and permitted the parties to proffer oral argument. *Doc. 41.*  Having considered the parties' briefing, entertained oral argument, and examined relevant case law, I recommend that Defendant's Motion to Suppress be denied.

---

[1]     *Doc. 30.*

[2]     *Doc. 46.*

I.       **FACTUAL BACKGROUND**

In January 2010, officers of the Border Enforcement Security Task Force ("BEST")

received information from Customs and Border Protection Officer ("CBPO") E. Lively

concerning a previously deported alien who had returned to the United States.

Suppression Hrg. Tr. 6:20-7:15, June 22, 2011.  Specifically, CBPO Lively alerted BEST

Senior Special Agent ("SSA") Larry Horgan, by the transmission of a memorandum, that

a previously deported alien by the name of Eutimio Rios-Galaviz had returned to the

United States without authorization, in violation of 8 U.S.C. § 1326.  *Id.* at 6:20-8:11.

Following his receipt of the memorandum, SSA Horgan and Special Agent ("SA")

Johnny Alvarez, also assigned to BEST,  began an investigation of Defendant Eutimio Rios-

Galaviz ("Defendant").  As the first step in the investigation, SSA Horgan conducted

surveillance of the address on North Gate transmitted by CBPO Lively.  *Id.* at 9:12-13.[3]

While SSA Horgan conducted surveillance, SA Alvarez began to run computer background

checks to confirm that Defendant did not have legal authorization to be in the United

States. *Id.* at 9:22-10:6.  These checks, which SA Alvarez conducted in April 2010, were first

undertaken through the Central Index System, known as CIS.  *Id.* at 10:13-19.  By inputting

Defendant's name and date of birth into the system, SA Alvarez was able to retrieve not

only Defendant's alien registration file ("A-file"), but his Immigration Form 205 ("I-205").

---

[3]       Initial surveillance by SSA Horgan did not reveal the presence of
Defendant at the residence.  Suppression Hrg. Tr. 9:12-17, June 22, 2011.

*Id.* at 11:3-16.   The I-205, which serves as a warrant for and record of deportation, memorializes that Defendant was deported from the United States to Mexico on August 24, 2000, through the Paso del Norte Bridge in El Paso, Texas.  *Id.* at 11:17-12:3.  Additional checks of the Enforced Alien Removal Module, known as EARMS, also substantiated Defendant's removal from the United States.  *Id.* at 13:25-14:9.

During his searches of CIS, SA Alvarez also probed for evidence that Defendant might have received permission to re-apply for admission to the United States, notwithstanding his prior deportation.  *Id.* at 12:6-10.  Such permission would be reflected by an approved Immigration Form 212 ("I-212").  *Id.* at 12:12.  At no time in his searches of CIS did SA Alvarez find evidence of an approved I-212 in CIS.  *Id.* at 12:17-21.  Furthermore, SA Alvarez found no evidence in the Computer-Linked Application Information Management System, known as CLAIMS, that Defendant had received an approved I-212.  *Id.* at 13:9-21.

Sometime after SA Alvarez completed his computer queries on Defendant, he and his partner, SA Gonzalez, again traveled to Defendant's residence to conduct surveillance. *Id.* at 14:19-24.  While they conducted surveillance of the residence, SA Alvarez observed Defendant's son using the mailbox at the address believed to be Defendant's.  *Id.* at 15:7-10. SA Alvarez recognized Defendant's son from a period of six to eight years prior, when Defendant and SA Alvarez attended the same gym.  *Id.* at 15:11-20.  Through SA Alvarez' interaction with Defendant at the gym, SA Alvarez had observed Defendant's son and was

able to positively identify Defendant's son at the North Gate address.  *Id.* at 15:21-16:11.

Despite locating his son at the address, agents were unable to locate Defendant at the

premises, and consequently, they terminated surveillance.  *Id.* at 16:12-16.

In October 2010, BEST received another tip that Defendant was residing at the

address on North Gate.  *Id.* at 17:6-8.  This second report differed from the first in that it

originated with a member of the public via the "tip line," and detailed Defendant's address,

his social security number, the fact of his previous deportation, and similar facts concerning

his wife.  *Id.* at 17:11-14.  Following receipt of this second lead, SA Alvarez and Border

Patrol Agent ("BPA") V. Acosta obtained pictures of Defendant and traveled to the North

Gate address to effect his arrest.  *Id.* at 18:19-19:5.

### A.      Arrest of Defendant Eutimio Rios-Galaviz

Just before 7:00 a.m. on December 20, 2010, SA Alvarez and BPA Acosta waited in

an unmarked car near the address on North Gate and prepared to arrest Defendant.  *Id.* at

23:8-14; 51:14-15.  At approximately 7:00 a.m., Defendant exited his house.  *Id.* at 23:16-18.

As Defendant walked from his house to his truck, SA Alvarez employed binoculars to

compare his features with the photograph he had printed, and determined that the

individual leaving the home was Defendant.  *Id.* at 25:3-7; 50:20-21.

Defendant entered his truck and departed from his residence.  *Id.* at 25:8-10.  As he

rounded the next block, SA Alvarez and BPA Acosta conducted a traffic stop of his vehicle.

 *Id.* at 25:11-15.  Following the stop, BPA Acosta approached Defendant's vehicle and

identified himself.  *Id.* at 25:17.  BPA Acosta then asked Defendant to produce his driver's

license, and after he had done so, BPA Acosta requested that Defendant exit his vehicle.

*Id.* at 33:19-22.

Shortly thereafter, SA Alvarez also approached Defendant with his badge hanging

on a chain around his neck.  *Id.* at 25:19-20; 51:21-24.  Defendant recognized SA Alvarez,

and the two shook hands.  *Id.* at 25:20-21.  After they had shaken hands, SA Alvarez

presented Defendant with the I-205 bearing his photograph and name, and asked him "if

that was him on the 205," and if "he'd been deported."  *Id.* at 25:21-22.  Defendant replied

in the affirmative.  *Id.* at 25:22.  As a result, SA Alvarez informed Defendant that he and

BPA Acosta were taking him "into the office."  *Id.* at 25:21-22.[4]

B.      **Processing of Defendant Eutimio Rios-Galaviz**

SA Alvarez and BPA Acosta then transported Defendant to the Immigration and

Customs Enforcement ("ICE") office, where they ran his fingerprints in the Integrated

Automated Fingerprint Identification System, known as IAFIS.  *Id.* at 26:21-22.  Once his

fingerprints had been scanned, IAFIS returned results showing that Defendant had been

previously deported. *Id.* at 26:23-25.  At that point, BPA Acosta read Defendant his *Miranda*

warning of rights.  *Id.* at 27:2.

When BPA Acosta finished reading Defendant his rights in Spanish, Defendant

---

[4]      At a time proximate to this exchange, BPA Acosta conducted a computer
query of Defendant's driver's license, and it came back to Defendant.  *Id.* at 26:1-5.

acknowledged his understanding in Spanish.  *Id.* at 28:11-21.  Nevertheless, Defendant refused to sign his warning of rights.  *Id.* at 28:21-23.  Furthermore, Defendant invoked his right to counsel.  *Id.* at 28:23-24.

Following the recitation of Defendant's rights and his invocation of right to counsel, agents proceeded to process him by asking him standard, biographical questions.  *Id.* at 29:15-21.  Fundamentally, these queries elicited the information required to populate the fields of an Immigration From 213 ("I-213") Record of Deportable Alien.  *Id.* at 29:17. Among others, these included his height, weight, date of birth, his place of birth, mother's name, his father's name, his wife's name, his country of citizenship, and the date, place, time, and manner of his last entry into the United States.  *Id.* at 29:18-19; 54:22-59:9.  When agents finished processing Defendant, SA Alvarez informed him that he was being charged with Re-entry of a Removed Alien, in violation of 8 U.S.C. § 1326.  *Id.* at 29:25-30:1. Thereafter, agents transported Defendant to Dona Ana County Detention Center.  *Id.* at 31:5-6.

## II.    PROCEDURAL HISTORY

On January 19, 2011, a federal grand jury returned an Indictment charging Defendant with one count of Re-entry of a Removed Alien, in violation of 8 U.S.C. § 1326(a) & (b). *Doc. 14.*

On May 23, 2011, Defendant filed his Motion to Suppress.  *Doc. 31.*  In his Motion to Suppress, Defendant sought suppression of the evidence collected in his case on three

grounds: (1) "because there was no reasonable suspicion to stop [Defendant];" (2) "[because the evidence] was obtained in violation of *Miranda*; and (3) because "the evidence from the illegal stop [and] interrogation of [Defendant] is fruit of the poisonous tree." Def.'s Mot. to Suppress 2-5.

On May 31, 2011, the Government filed its "Response to Defendant's Motion to Suppress" ("Response"). *Doc. 32.* The Government's Response opposed Defendant's Motion to Suppress on two principal grounds: (1) that "agents had probable cause to arrest [Defendant];" and (2) that agents had no obligation to administer *Miranda* warnings. Government's Resp. 2-5.

On June 6, 2011, United States District Judge Robert C. Brack referred this case to me to conduct hearings and to perform whatever legal analysis might be required to recommend an ultimate disposition of Defendant's Motion to Suppress. *Doc. 34.* In keeping with Judge Brack's Order, on June 22, 2011, I held a hearing on Defendant's Motion to Suppress. *Doc. 41.*

At the hearing of June 22, 2011, the Government's evidence established that probable cause existed for the arrest of Defendant. In fact, the evidence was such that Defendant withdrew his Motion to Suppress on Fourth Amendment grounds. Suppression Hrg. Tr. 74:13-14. Defendant, however, persisted in his Motion to Suppress on Fifth Amendment grounds. *Id.* Moreover, Defendant moved this Court to allow him time to file additional briefing on the issue. *Id.* at 73:23-25. For its part, the Government did not object, and as a

consequence, I allowed each party one week to file their briefs following receipt of the hearing transcript.  *Id.* at 76:2-5.

On July 6, 2011, Defendant filed his "Memorandum of Law in Support of Defendant's Motion to Suppress Oral Statements" ("Memorandum").  *Doc. 46.*  Therein, Defendant argues that "[t]he facts surrounding the initial stop of [] Defendant would have led a reasonable person to conclude he was in custody."  Def.'s Mem. 2.  Additionally, Defendant contends that at two subsequent junctures - the point at which SA Alvarez informed him "we're going to take you into the office," and next, the time at which SA Alvarez and BPA Acosta asked him if someone could pick up his truck - agents should have recognized that Defendant was "in custody" and provided him *Miranda* warnings. *Id.* at 2-3.  On these two grounds, Defendant prays "that all statement[s] made by [] Defendant [] be suppressed and excluded as evidence."  *Id.* at 3.

On July 8, 2011, the Government filed its "Response to Defendant's Memorandum of Law in Support of His Motion to Suppress" ("Memo Response").  *Doc. 47.*  In reference to the statements made during his arrest, the Government contends that agents had probable cause to arrest Defendant and therefore were under no obligation to advise him of his *Miranda* rights.  Government's Mem. Resp. 4.  Alternatively, the Government argues that the questions posed by SA Alvarez were not intended to elicit incriminating information, since agents already had ample information to establish that Defendant had violated 8 U.S.C. § 1326.  *Id.*  Finally, as to the statements obtained from Defendant during

processing, the Government posits that these answers concerned basic biographical and physical information regarding Defendant and therefore met the "booking exception" to *Miranda. Id.* at 5. For these reasons, the Government urges this Court to deny Defendant's Motion to Suppress in its entirety.

## III.    RELEVANT FIFTH AMENDMENT LAW

The Self-Incrimination Clause of the Fifth Amendment states: "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. Statements made by a defendant during a custodial interrogation by a law enforcement officer are generally not admissible as evidence against that defendant if the declarant has not received the warnings that *Miranda v. Arizona* requires. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000); *United States v. Chee*, 514 F .3d 1106, 1112 (10th Cir. 2008); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). The requirements of *Miranda*, however, are limited. "Police officers need not administer *Miranda* warnings to everyone they question." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). Rather, "*Miranda* applies only to 'custodial interrogation[s].'" *Id.* at 1239 (quoting *Miranda*, 384 U.S. at 444). In other words, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *Chee*, 514 F.3d at 112 (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

A person is not in custody "simply because law enforcement officers question him, and a consensual encounter does not become custodial simply because the person being

questioned is the target of an investigation." *United States v. Guerrero-Hernandez*, 95 F.3d

983, 986 (10th Cir. 1996). The in-custody requirement is satisfied only when a suspect's

"freedom of action is curtailed to the degree associated with formal arrest." *Berkemer v.*

*McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

*See Jones*, 523 F.3d at 1239.  Further, "'the initial determination of custody depends on the

objective circumstances of the interrogation, not on the subjective views harbored by either

the interrogating officers or the person being questioned.'" *United States v. Rogers*, 391 F.3d

1165, 1171 (10th Cir. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).  In

determining the custodial nature of an interrogation, the court must "determine whether

'a reasonable person in the suspect's position would have understood the situation as the

functional equivalent of formal arrest.'" *Chee*, 514 F.3d at 1112 (quoting *Berkemer*, 468 U.S.

at 442) (alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the

circumstances is fact intensive, has instructed district courts to consider a number of

non-exhaustive factors in determining whether a custodial interrogation took place.  *See*

*Jones*, 523 F.3d at 1240.  Those factors include: (1) the degree to which the suspect is

informed that he or she may end the interview at will or is not required to answer

questions; (2) whether the nature of the interview is likely to create a coercive environment

from which a suspect would not feel free to leave, such as where there is prolonged

accusatory questioning; and (3) whether the police dominate the encounter with the

-10-

suspect. *See id.*, 523 F.3d at 1240 (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993)).  Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory. *See id.* The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others. *See id.*

## IV.    DISCUSSION

In his Memorandum, Defendant advances three individuated grounds for the suppression of statements and corollary evidence obtained from his person, his arrest and processing.  Nevertheless, Defendant's arguments do not find sufficient support in the facts of his case or from extant case law.   The deficiencies of each claim will be discussed *seriatim*.

### A.    Defendant's Statement at the Roadside Did Not Violate His Fifth Amendment Rights

As a threshold matter, Defendant argues that law enforcement should have administered his *Miranda* warnings during his roadside stop. Def.'s Mem. 2-3. Based upon the facts of the case, however, Defendant was not subject to custodial interrogation during

his roadside encounter, and as a consequence, this argument must fail.

As discussed above, for a defendant's Fifth Amendment right to *Miranda* warnings to attach, the defendant must be *both* in custody and subject to interrogation.  In the absence of either element, the requirement of *Miranda* warnings will not attach.  *See Jones*, 523 F.3d at 1239.  Or, as the Tenth Circuit has held, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  *Chee*, 514 F.3d at 112 (quoting *Perdue*, 8 F.3d at 1463). Therefore, without reaching the question of whether the query posed by SA Alvarez constituted interrogation, the facts must first establish that Defendant was in custody.

Defendant's encounter with law enforcement began with the initial traffic stop and the request by BPA Acosta to exit the vehicle and produce his driver's license. Suppression Hrg. Tr. 33:19-22. Very soon thereafter, SA Alvarez presented Defendant with the I-205 bearing his photograph and name, and asked him "if that was him on the 205," and if "he'd been deported."  *Id.* at 25:21-22.  Defendant replied in the affirmative.  *Id.* at 25:22.  Only after Defendant's answer did SA Alvarez inform Defendant that he and BPA Acosta were taking him "into the office."  Defendant made no other relevant statements along the side of the road.[5]

---

[5]  The only other information solicited by agents during the traffic stop concerned locating Defendant's son so that he might transport Defendant's vehicle from the scene. *Id.* at 26:9-14.

Ordinarily, a traffic stop does not constitute custody within the meaning of *Miranda*. *See United States v. Martinez*, 983 F.2d 968, 976-77 (10th Cir. 1992) (*citing Berkemer v. McCarty*, 468 U.S. 420 (1984)).  "The reasoning behind this rule is a routine traffic stop is 'presumptively temporary and brief' and the circumstances surrounding a typical traffic stop 'are not such that the motorist feels completely at the mercy of the police.'"  *Id.*  In fact, at the moment that SA Alvarez asked him to confirm that he had been deported, the traffic stop of Defendant had been very brief.  Defendant argues that this "question alone would lead a reasonable person to conclude he was in custody since he is being asked specific questions about identity that might tie him to the commission of a crime."  Def.'s Mem. 2.  However, *Terry* stops do not ordinarily require *Miranda* warnings despite the fact that questions during any such stop are directed toward confirming or dispelling an officer's suspicions that the individual "has committed, is committing, or is about to commit a crime."  *Berkemer*, 468 U.S. at 439 (*citing Terry v. Ohio* 392 U.S. 1, 29 (1968)).

In fact, none of the factors support a finding of custodial interrogation while Defendant was along the side of the road.  *Compare Perdue*, 8 F.3d at 1455 (officers who drew their weapons and forced defendant to the ground while conducting *Terry* stop created a custodial situation in which *Miranda* warnings were required).  First, while Defendant was not informed of his right to "end the interview," it is a stretch to even describe the two quick questions as an interview.  *See Jones*, 523 F.3d at 1240.  In fact, Defendant's encounter, at that point, was significantly shorter than most encounters

involving traffic citations.  Second, the nature of the interview was not likely to create a coercive environment.  *Id.*  As noted, there was no prolonged accusatory questioning.  In fact, because of the previous interactions between Defendant and SA Alvarez, the exchange was friendly and the two first shook hands.  Suppression Hrg. Tr. 33:23-25.  Third, there were no indicia of a police dominated environment.  *Id.*  Defendant was not separated from others or isolated in any way.  Neither officers acted in a threatening manner, displayed weapons or made physical contact beyond the friendly handshake.

Simply put, prior to the agents' statement that they were taking Defendant into the office, a reasonable person in Defendant's position would not have understood the situation along the side of the road as the functional equivalent of arrest.  *See Chee*, 514 F.3d. at 1112.  As such, I find that Defendant was not in custody at the time of his admission to SA Alvarez concerning his prior deportation.  Accordingly, I recommend that this ground for suppression be denied.

**B.     Defendant's Statements at the ICE Station Did Not Violate his Fifth Amendment Rights**

By the time Defendant arrived at the ICE station with SA Alvarez and BPA Acosta, the facts clearly demonstrate that he was in custody.  The Government, through SA Alvarez, admits as much.  Suppression Hrg. Tr. 26:17-19.

Once Defendant arrived at the ICE station, SA Alvarez testified that his fingerprints were run in the Integrated Automated Fingerprint Identification System, known as IAFIS.

*Id.* at 26:21-22.  Once his fingerprints had been scanned, IAFIS indicated that Defendant had

been previously deported.  *Id.* at 26:23-25.  At that point, BPA Acosta read Defendant his

*Miranda* warning of rights.  *Id.* at 27:2.

When BPA Acosta finished reading Defendant his rights in Spanish, Defendant

acknowledged his understanding in Spanish.  *Id.* at 28:11-21.  Nonetheless, Defendant

refused to sign his warning of rights.  *Id*. at 28:21-23.  Defendant did, in fact, invoke his

right to counsel.  *Id*. at 28:23-24.

Following Defendant's refusal to sign and his invocation of his right to counsel, law

enforcement officials asked Defendant a number of questions required for the completion

of the "I-213, Record of Deportable Alien" form.  These questions included his height,

weight, date of birth, his place of birth, mother's name, his father's name, his wife's name,

his country of citizenship, and the date, place, time, and manner of his last entry into the

United States.  *Id.* at 29:18-19; 54:22-59:9.  Because Defendant provided law enforcement

with responses to these inquiries, the Court must determine if they were obtained in

violation of his Fifth Amendment right to remain silent.[6]

---

[6]     Defense counsel might have also argued that the responses to these
queries violated Defendant's Fifth Amendment right to counsel.  However, this
argument was not advanced in any of Defendant's pleadings nor in his oral argument
to the Court.  Notwithstanding the apparent waiver of that argument, even if counsel
had presented this argument, it would fail under the same "booking exception" that
overcomes the argument that these responses were given in violation of the right to
remain silent.  *See infra* pp.17-20.

1.      **Defendant's refusal to sign his warning of rights did not invoke his right to remain silent**

Prior to 2010, federal courts had split on when a defendant could be conclusively determined to have invoked his right to silence.  In 2010, the Supreme Court took up the issue and held that any "accused who wants to invoke his or her right to remain silent" must "do so unambiguously."  *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010).  The Court explained that "[t]reating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights 'might add marginally *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 425 (1986)).  Yet, the Court found that "'as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.'" *Id.* (quotation and citation omitted).

Applying this principle to the facts in *Berghuis*, the Court found that the accused "did not say that he wanted to remain silent or that he did not want to talk with the police." *Id.*  The Court opined that "[h]ad he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." *Id.*  (internal quotation marks and citations omitted).  Because the accused in *Berghuis* had done neither, the Court held that "he did not invoke his right to remain silent." *Id.*

In the instant case, Defendant refused to sign his *Miranda* warning of rights. Suppression Hrg. Tr. 28:21-23.  Nonetheless, given that he proceeded to answer questions

without objection, under the rule in *Berghuis*, his failure to sign the rights form falls short of the unambiguous declaration required to invoke the right to remain silent. *See Berghuis*, 130 S. Ct. at 2260. Consequently, I find that the biographical answers elicited from Defendant at the ICE station were not taken in violation of an invocation of his right to remain silent.

> ### 2. Even if Defendant had invoked his right to remain silent, the "booking exception" allowed officers to collect the information

Assuming, *arguendo*, that Defendant had validly invoked his right to remain silent, the officers' request for his biographical information would nevertheless fail to offend his Fifth Amendment right against self-incrimination. It is well established that the "routine booking question" exception "exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Later, this exception was applied in the immigration context by the Tenth Circuit in *United States v. Medrano*. *See United States v. Medrano*, 356 F. App'x 102 (10th Cir. 2009) (unpublished).

In *Medrano*, the Tenth Circuit considered whether biographical information elicited from a defendant *without* the benefit of *Miranda* warnings offended his Fifth Amendment rights. *See id.* There, as in the instant case, a law enforcement agent, while processing a suspect believed to be in the country illegally, did the following:

> . . . asked Defendant his name, date of birth, city and country of birth, and entry point into the United States in order to complete administrative Form I–213. This booking process also included taking Defendant's photograph and fingerprints on an IDENT machine, a biometric identification system. When the IDENT machine processed Defendant's photograph and fingerprints, it confirmed that he had previously been removed from the United States.

*Id.* at 107.  In a further parallel with the instant case, the court noted that "there is no objective evidence suggesting that the agent asked questions regarding Defendant's name and citizenship for the purpose of eliciting incriminating information." *Id.*  To the contrary, the Court observed "he did not have to: he already had ample information about and evidence of Defendant's name, citizenship, and prior removals." *Id.*  In sum, the *Medrano* court observed that these questions were "posed while Defendant was being booked into an immigration processing facility, his answer[s] [were] noted on an administrative form used to process all immigrants at the facility, and the agent did not attempt to coerce his response[s] with a view to proving an essential element of a charge or conviction." *Id.*  As a consequence, the *Medrano* court found that "Defendant's *Miranda* rights were not violated." *Id.*

Having considered the evidence, I find that the questions posed to Defendant at the ICE station represent precisely the type of routine, biographical booking information exempted from the rigors of *Miranda*.  *See Muniz*, 496 U.S. at 601.  The preponderance of this information - including his height, weight, date of birth, place of birth, mother's name, father's name, and his wife's name - constitutes purely biographical matters, and as such,

clearly falls within the "booking exception" to *Miranda*. *See id.* *Medrano* also makes clear that the questions concerning his citizenship and manner of entry into the United States fall within the "routine booking question" exception in this context. *See Medrano*, 356 F. App'x at 107. Just as in *Medrano*, the agents in the instant case advanced these questions not for the purpose of inculpation, but to complete the administrative Form I-213 that is required for all immigrants processed at the facility. *See id.* Also, on facts similar to those in *Medrano*, the agents had no need to elicit inculpatory statements from Defendant, as they already had sufficient evidence concerning Defendant's citizenship and prior removals to charge him with a criminal offense. *See id.* For these reasons, I find that Defendant's answers to biographical and administrative questions posed by agents at the ICE station fall within the "booking exception" to *Miranda* and do not implicate his Fifth Amendment right against self-incrimination. *See Muniz*, 496 U.S. at 601; *Medrano*, 356 F. App'x at 107.

Under the *Berghuis* holding, I find that Defendant did not validly invoke his right to remain silent by refusing to sign his *Miranda* warning of rights. Even assuming he had done so, I would nonetheless find that the questions posed to him for the purposes of completing his I-213 did not offend his Fifth Amendment right against self-incrimination. Therefore, I recommend that Defendant's Motion to Suppress on these grounds be denied.

C.     **Even if Defendant's Statements Were Taken in Violation of *Miranda*, Evidence Derived Therefrom May Not be Suppressed**

As a final ground for suppressing the evidence of his immigration status, Defendant argues that Defendant's fingerprints must be suppressed as "fruit of the poisonous tree." Def.'s Mot. to Suppress 5.  By his estimation, "the fruits of the illegal seizure include not only any statements made by [Defendant], but also . . . any evidence derived or located based on comparison of identification data in his files with identification data obtained through the illegal arrest."  *Id.*  Defendant avers that "all evidence flowing therefrom, including evidence of identification, must be suppressed."  *Id.*

At the suppression hearing of June 22, 2011, Defendant withdrew his Motion to Suppress on Fourth Amendment grounds.  Suppression Hrg. Tr. 74:13-14.  Therefore, to the extent this contest survives, it must necessarily be directed towards suppressing evidence derived from supposed violations of Defendant's Fifth Amendment rights.  As such, this claim must fail.

In *United States v. Patane*, the Supreme Court concluded that the exclusionary rule - or "fruit of the poisonous tree doctrine" - does not apply "to mere failures to give *Miranda* warnings[.]"  *United States v. Patane*, 542 U.S. 630, 643 (2004) (plurality).  Relying on *Patane*, the Tenth Circuit subsequently held that physical evidence obtained as a fruit of a defendant's uncoerced statement to a police officer is admissible at trial "regardless of whether the officer gave the defendant *Miranda* warnings."  *United States v. Phillips*, 468

-20-

F.3d 1264, 1265 (10th Cir. 2006).

In *Phillips*, police recovered a gun and jacket with blood on it near the scene of a robbery. *Id.* at 1265. In response to an officer's inquiry about his limp, the defendant stated he had been shot. *Id.* Before posing the question, however, the officer did not present the defendant with his *Miranda* warnings. *Id.* Even so, based upon this response, the officer prepared an affidavit for a search warrant seeking a swab of defendant's DNA. *Id.* Law enforcement secured the necessary warrant and obtained a swab from the defendant. *Id.* The DNA obtained from the swab matched that of the blood on the jacket. *Id.* Following the filing of charges against him, Mr. Phillips claimed the warrant for the swab was defective because the supporting affidavit relied on the statement he offered to Detective Lyons without a *Miranda* warning. *Id.* at 1266. Consequently, he asserted that the DNA evidence recovered through the warrant should have been suppressed. *Id.*

In crafting its decision, the Tenth Circuit relied heavily on the Supreme Court's prior holding in *Patane*. Building upon the *Patane* holding, the Tenth Circuit held the DNA evidence admissible despite the lack of a *Miranda* warning. *Id.* at 1266. They reasoned that "the *Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id.* (internal quotations marks and citations omitted). Furthermore, they cited to one of their own holdings for the proposition that "the prosecution may still introduce physical evidence seized as a result of a *Miranda* violation." *Id.* (quoting *United*

*States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006)).  Based upon these holdings, the *Phillips* court concluded that "[t]he essential point is that the evidence admitted at trial was physical evidence," and as such, that evidence did not implicate the defendant's Fifth Amendment right against self-incrimination.  *Id.*

The only exception to the *Patane/Phillips* rule is where the statements which lead to the physical evidence, are, in addition to being made without the advice of *Miranda* rights, made involuntarily.  *See Patane*, 542 U.S. at 640 (citing *Chavez v. Martinez*, 538 U.S. 760, 769 (2003); *Oregon v. Elstad*, 470 U.S. 298, 307-08 (1985)); *see also Phillips*, 468 F.3d at 1266.  Here, Defendant has not argued that his statements were involuntary and the evidence would not support such a finding.  Therefore, to the extent Defendant seeks to suppress evidence beyond his statement, the Court can grant him no relief.  Fingerprints plainly represent physical evidence, and the Tenth Circuit unambiguously  holds that such evidence does not constitute "fruit of the poisonous tree."  *Phillips*, 468 F.3d at 1266.  Accordingly, I recommend denying this ground for suppression.

## V.     CONCLUSION

For the reasons outlined above, I recommend **DENYING** Defendant's Motion to

Suppress.  *Doc. 31.*

**IT IS SO RECOMMENDED.**

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE